IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GLENN W. GARY,

        Petitioner,                  No. 2: 08-cv-0946 GEB KJN P

     vs.

M. C. KRAMER,

        Respondent.           FINDINGS AND RECOMMENDATIONS

_____/

I. <u>Introduction</u>

        Petitioner is a state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1982, petitioner was convicted of first degree murder with use of a firearm.  Petitioner is serving a sentence of twenty-seven years to life.

        In the instant action, petitioner challenges the 2007 decision by the California Board of Parole Hearings ("BPH") finding him unsuitable for parole.  This was petitioner's fourth subsequent, i.e. fifth overall, suitability hearing.  This action is proceeding on the original petition filed by petitioner on May 2, 2008.  Petitioner argues that the 2007 decision by the BPH finding him unsuitable for parole was not supported by sufficient evidence.

        After carefully considering the record, the undersigned recommends that the petition be denied.

II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 405.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law. . . .  [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

1    inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

2    unnecessary showing of uniformed guards does not qualify as clearly established law when

3    spectators' conduct is the alleged cause of bias injection).

4      The state courts need not have cited to federal authority, or even have indicated

5    awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

6    Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

7    unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

8    one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

9    Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

10   reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

11   as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

12   Packer, 537 U.S. at 9.

13     However, where the state courts have not addressed the constitutional issue in

14   dispute in any reasoned opinion, the federal court will independently review the record in

15   adjudication of that issue.  "Independent review of the record is not de novo review of the

16   constitutional issue, but rather, the only method by which we can determine whether a silent state

17   court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

18   2003).

19     When reviewing a state court's summary denial of a claim, the court "looks

20   through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

21   F.3d 1072, 1079 n.2 (9th Cir. 2000).

22     The Stanlislaus County Superior Court issued the last reasoned opinion addressing

23   petitioner's claims challenging the 2007 suitability hearing.  (Respondent's Exhibits 2, 4, 6.)  The

24   Superior Court's order stated,

25   ////

26   ////

1    > The Court has received, read, and considered the Petition for Writ
     > of Habeas Corpus and accompanying documentation.

2

3    > The Court finds evidence to support the Board of Parole Hearings'
     > conclusion of unsuitability for parole and its denial decision based
     > on the Board's conclusion that petitioner continued to pose an

4    > unreasonable risk of danger to society or a threat to public safety.
     > The petition is hereby denied.

5

6    (Respondent's Exhibit 2.)

7            The undersigned considers whether this order was an unreasonable application of

8    clearly established Supreme Court authority.

9    III.  Discussion

10           A.  Legal Standards

11           The Due Process Clause of the Fourteenth Amendment to the United States

12   Constitution prohibits state action that "deprive[s] a person of life, liberty or property without

13   due process of law."  U .S. Const. amend. XIV, § 2.  A person alleging a due process violation

14   must demonstrate that he or she was deprived of a protected liberty or property interest, and then

15   show that the procedures attendant upon the deprivation were not constitutionally sufficient.

16   Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan,

17   306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due

18   Process Clause itself or from state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

19   In the context of parole, the United States Constitution does not, in and of itself, create a

20   protected liberty interest in the receipt of a parole date, even one that has been set.  Jago v. Van

21   Curen, 454 U.S. 14, 17-21 (1981).  However, when a state's statutory parole scheme uses

22   mandatory language, it "'creates a presumption that parole release will be granted' when or

23   unless certain designated findings are made, thereby giving rise to a constitutional liberty

24   interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S.

25   1, 12 (1979)).

26   ////

4

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417 (2005). Generally, one year prior to an inmate's minimum eligible parole release date, the Board will set a parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." In re Lawrence, 44 Cal.4th 1181, 1202, 82 Cal.Rptr.3d 169 (2008) (citing Cal.Penal Code § 3041(a)). A release date will not be set, however, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration. . . ." Cal. Penal Code § 3041(b).

California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12); Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006)); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion, 306 F.3d at 903.

In the context of parole proceedings, it is well established that inmates are not guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process Clause. See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987). Nonetheless, inmates are afforded limited procedural protections. The Supreme Court has held that a parole board's procedures are constitutionally adequate so long as the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. Hayward v. Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (quoting Greenholtz, 442 U.S. at 16). As a matter of state constitutional law, denial of parole to California inmates must be supported by "some evidence" demonstrating future dangerousness. Hayward, 603 F.3d at 562 (citing In re

1   <u>Rosencrantz</u>, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); <u>see also</u> <u>In re Lawrence</u>, 44

2   Cal.4th at 1191, 82 Cal.Rptr.3d 169 (recognizing  the denial of parole must be supported by

3   "some evidence" that an inmate "poses a current risk to public safety"); <u>In re Shaputis</u>, 44 Cal.4th

4   1241, 1254, 82 Cal.Rptr.3d 213 (2008) (same).  "California's 'some evidence' requirement is a

5   component of the liberty interest created by the parole system of [the] state," <u>Cooke v. Solis</u>, 606

6   F.3d 1206, 1213 (9th Cir. 2010), petition for cert. filed, 79 U.S.L.W. 3141 (U.S. Sept. 2, 2010)

7   (No. 10-333), and compliance with this evidentiary standard is, therefore, mandated by the

8   federal Due Process Clause.  <u>Pearson v. Muntz</u>, 625 F.3d 539, 549 (9th Cir. 2010).  Thus, a

9   federal court undertaking review of a "California judicial decision approving the . . . decision

10  rejecting parole" must determine whether the state court's decision "was an 'unreasonable

11  application' of the California 'some evidence' requirement, or was 'based on an unreasonable

12  determination of the facts in light of the evidence.'"  <u>Hayward</u>, 603 F.3d at 562-63 (quoting 28

13  U.S.C. § 2254(d)(2)).

14          When assessing whether a state parole board's suitability decision was supported

15  by "some evidence," the analysis "is framed by the statutes and regulations governing parole

16  suitability determinations in the relevant state."  <u>Irons</u>, 505 F.3d at 851.  The court must

17  look to California law to determine what findings are necessary to deem a petitioner unsuitable

18  for parole, and then must review the record to determine whether the state court decision holding

19  that these findings were supported by "some evidence" or whether it constituted an unreasonable

20  application of the "some evidence" principle.  <u>Id</u>.

21          Title 15, Section 2402 of the California Code of Regulations sets forth various

22  factors to be considered by the Board in its parole suitability findings for murderers.  The

23  regulation is designed to guide the Board's assessment regarding whether the inmate poses an

24  "unreasonable risk of danger to society if released from prison," and thus whether he or she is

25  suitable for parole.  <u>In re Lawrence</u>, 44 Cal.4th at 1202, 82 Cal.Rptr.3d 169.  The Board is

26  directed to consider all relevant, reliable information available, including the circumstances of

the prisoner's:  social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  15 Cal.Code Regs. § 2402(b).

The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  15 Cal. Code Regs. § 2402(c)-(d).  Factors tending to show unsuitability include:

(1) The Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled, or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(15 Cal. Code Regs. § 2402(c).)

Factors tending to show suitability include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

(15 Cal. Code Regs. § 2402(d).)

The overriding concern is public safety, In re Dannenberg, 34 Cal.4th at 1086, 23 Cal.Rptr.3d 417, and the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205, 82 Cal.Rptr.3d 169.  Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence

8

1   indicates that a parolee's release would unreasonably endanger public safety.  In re Shaputis, 44

2   Cal.4th at 1241, 82 Cal.Rptr.3d 213.  Therefore, "the circumstances of the commitment offense

3   (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those

4   circumstances are probative to the determination that a prisoner remains a danger to the public."

5   In re Lawrence, 44 Cal.4th at 1212, 82 Cal.Rptr.3d 169.  In other words, there must be some

6   rational nexus between the facts relied upon and the ultimate conclusion that the prisoner

7   continues to be a threat to public safety.  Id. at 1227, 82 Cal.Rptr.3d 169.

8          B.  Analysis

9          The BPH found petitioner unsuitable for parole in 2007 for the following reasons.

10   First, the BPH found that the offense was committed in a "particularly cruel, vicious and callous"

11   manner and demonstrated a "callous disregard for young life."  (Dkt. No. 1, part 2, at 18 of 121.)

12   Second, the BPH found that the offense was carried out in a "premeditated and calculated"

13   manner.  (Id.)  Third, the BPH found that the motive for the crime was inexplicable.  (Id.)

14   Fourth, the panel found that petitioner had an unstable social history.  (Id., at 20.)  Fifth, the BPH

15   found that petitioner had a pattern of escalating criminal conduct.  (Id., at 21.)  Sixth, the BPH

16   found that petitioner minimized his involvement in the motorcycle gang.  (Id., at 25.)  The

17   undersigned must first consider whether the record supported these findings.

18          In order to put these findings into context, the undersigned will first summarize

19   the facts of the commitment offense as discussed at the 2007 suitability hearing:

20          On 3/10 of 1981, Michael Hanson, also known as Harley,
       telephoned the victim, KC Wallace, at his residence at
21       approximately 11:00 p.m. and requested that Mr. Wallace meet
       him in Turlock to engage in a drug transaction.  Mr. Wallace drove
22       his car to a parking lot behind the bar in Turlock known as The
       Office located near the Golden State Boulevard in East Main
23       Street.  Mr. Wallace accompanied Mr. Hanson to Modesto to the
       home of Frank Coelho, C-O-E-L-H-O, located at 1908 Manzanita.
24       While at Coelho's residence, Mr. Wallace was taken to the garage.
       Mr. Coelho and the Defendant, Glenn Gary, along with Michael
25       Hanson, questioned him about his association with the Heinman
       Motorcycle Club and his efforts to set Mr. Gary up for
26       assassination by certain members of the club.  Gary and Mr.

9

1  Coehlo were members [of] the motorcycle club known as the Bar
   Hoppers at that time.  During the questioning of Mr. Wallace, Gary
2  reportedly beat and kicked him several times in an attempt to attain
   information.  Gary, along with Michael Hanson and Frank Coehlo
3  then took Mr. Wallace to an orchard owned by Naraghi, N-A-R-A-
   G-H-I, Farms near the intersection of Keys and Bedsow Road in
4  Keys, California.  Gary drove his green Toyota Land Cruiser and
   parked some distance down the farm in an access road.  After the
5  men exited the vehicle, Wallace was again beaten.  Wallace was
   then taken approximately a hundred feet into the orchard at which
6  time Gary produced a .38 caliber revolver and shot Wallace in the
   face.  Wallace then fell to the ground and Gary approached him
7  and fired two additional times into Wallace's head.  The three men
   then left Wallace in the orchard and drove back to Modesto. The
8  following morning, Gary exchanged the tires on his vehicle.  The
   tires he obtained from the Merced area.  He then obliterated several
9  serial numbers on the tires that he had removed from his vehicle
   and discarded them in the Stanlislaus River near Salida, S-A-L-I-
10 D-A, California.  The day after Gary shot Wallace, he advised
   Victor Hammond that he 'blew the motherfucker away.'  When
11 asked by Hammond why he had shot Wallace with two, with two
   [sic] witnesses present, he stated that 'Oh well.  They knew I'm not
12 fucking around.  They know I mean business.'  Gary was
   subsequently arrested on 4/21/1981 for the violation of section 187
13 PC, transported to the county jail.

14 (Id., part 1, 37-40.)

15        In finding that the offense was committed in a "particularly cruel, vicious and

16 callous" manner and demonstrated a "callous disregard for young life," the BPH apparently

17 found that the offense was carried out in a manner demonstrating an exceptionally callous

18 disregard for human suffering.  (15 Cal. Code Regs. § 2402(c)(1)(D).)  The undersigned

19 considers whether the BPH properly found this factor.

20        "[T]o demonstrate 'an exceptionally callous disregard for human suffering' (15

21 Cal. Code Regs., § 2402, subd. (c)(1)(D)), the offense in question must have been committed in a

22 more aggravated or violent manner than that ordinarily shown in the commission of [first] degree

23 murder."  In re Scott, 119 Cal.App.4th 871, 891, 15 Cal.Rptr.3d 32 (2004.)

24        In re Van Houten (2004) 116 Cal.App.4th 339, 10 Cal.Rptr.3d 406
   illustrates the sort of gratuitous cruelty required. The prisoner in
25 that case was involved in multiple stabbings of a woman with a
   knife and bayonet. While she was dying, the victim was made
26 aware her husband was suffering a similarly gruesome fate. As

10

stated by the court, "[t]hese acts of cruelty far exceeded the minimum necessary to stab a victim to death." (Id. at p. 351, 10 Cal.Rptr.3d 406.) Other examples of aggravated conduct reflecting an "exceptionally callous disregard for human suffering," are set forth in Board regulations relating to the matrix used to set base terms for life prisoners (§ 2282, subd. (b)) [footnote omitted]; namely, "torture," as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to act resulting in death," and "severe trauma," as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim."

Id., at 891-92, 15 Cal.Rptr.3d 32.

In the instant case, the victim was beaten twice before being shot in the face and then twice in the head.  Based on these facts, the undersigned finds that the BPH properly found that the offense demonstrated a callous disregard for human suffering.

The undersigned next finds that the BPH properly found that the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.  (15 Cal. Code Regs. § 2402(c)(1)(B)).  As stated above, petitioner beat the victim, then drove him to a remote location, where he beat him again, then walked him into a field where he first shot him in the face then two additional times in his head.  See Boyd v. Almager, 677 F.Supp. 2d 1221, 1231 (C.D. Cal. 2009) (petitioner ambushed, robbed, beat and then shot, in an execution style manner, a young man delivering pizza; this crime was a cold-blooded, execution style murder that exceeded the minimum elements necessary for a first degree murder conviction.)

The BPH next found that the motive for the crime was "inexplicable or very trivial."  (15 Cal. Code Regs. § 2402(c)(1)(D).)  "The reference in Board regulations to motives that are 'very trivial in relationship to the offense' therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented."  In

1  re Scott, 119 Cal.App.4th 871, 893, 15 Cal.Rptr.3d 32 (2004).

2            Petitioner killed the victim because of his association with a rival motorcycle gang

3  and alleged involvement in a conspiracy to kill petitioner.  Considering all of the circumstances,

4  petitioner's motive for killing the victim was trivial.  The BPH properly found this factor in

5  finding petitioner unsuitable for parole.

6            The BPH found that petitioner had an unstable social history based upon his

7  involvement with the motorcycle gang that engaged in illegal activities.  (Dkt. 1, part 2, at 20 of

8  121.)  The regulations define an unstable social history as a history of unstable or tumultuous

9  relationships with others.  (15 Cal. Code Regs., § 2402(c)(3).)  During the hearing, petitioner

10  testified that the motorcycle club was originally a social club that transformed into a club

11  involved in criminal activities.  (Dkt. 1, part 1, at 63 of 99.)  The club was in the drug business,

12  which resulted in the members having weapons.  (Id., at 65.)   Petitioner's involvement in the

13  motorcycle club and rival club members is evidence of his unstable and tumultuous relationships

14  with others.

15            The BPH also found petitioner unsuitable for parole based on his escalating

16  pattern of criminal conduct.  The regulations do not specifically list an escalating pattern of

17  criminal conduct as a factor tending to show unsuitability.  However, one of the factors tending

18  to show unsuitability is a previous record of violence, defined as, "the prisoner on previous

19  occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner

20  demonstrated serious assaultive behavior at an early age."  (15 Cal. Code Regs., § 2402(c)(2).)

21  Petitioner's criminal record included the following misdemeanor convictions.  In 1973, petitioner

22  was arrested for assault with a deadly weapon.  (Dkt. 1, part 2, at 21 of 121.)  Petitioner was

23  arrested in 1974 for driving under the influence.  (Id.)  In 1977, petitioner was arrested for

24  assaulting a federal officer.  (Id.)  In 1981, petitioner was arrested for and convicted of carrying a

25  concealed weapon on his person.  (Id.)

26            Although petitioner's convictions were misdemeanor offenses, the undersigned

1    finds that his two assault convictions demonstrated a history of assaultive behavior, and at least

2    two of the arrests involved deadly weapons.

3              The BPH found that petitioner minimized his involvement in the motorcycle gang.

4    In making this finding, Presiding Commissioner Inglee stated,

5              We believe that you are still minimizing your activities as part of
               the gang even though you have come forward with more, with
6              more information regarding your relationship to the, to the gang
               and the sale and manufacture of drugs.  You tended to, you tried to
7              divorce yourself from the activities that [sic] the individual
               members of the gang.  They elected you twice as president but you
8              continued to tell us that when we talked about individual crime
               issues that came up, you said that you for the most part, you had
9              little or no activity or control over the members.  We believe that
               may not be the case.

10

11   (Id., at 24-25.)

12             Deputy Commissioner Smith later commented,

13             Mr. Gary, just one comment and, and it goes with, with your
               involvement in, in the motorcycle gang quite candidly disturbing
14             [sic].  You know, describing the gang as I heard you as being
               basically a bunch of guys together kind of doing their own thing
15             and there was some methamphetamine manufacture and selling
               involved and it was kind of an individual basis, is very contrary to
16             what my knowledge and background experience has been with
               outlaw and motorcycle gangs, that gangs are very territorial.  They
17             are extremely structured.  A violation for committing any wrong
               doing is dealt with in a very strict, very harsh manner and that no
18             one that's associated or an affiliated member of such a gang is
               going to participate in any activity without the participation,
19             cooperation and with the approval of the leadership of that gang.
               Now, that may not have been the case in the group that you were
20             associated with.  My suggestion would be that if that's the case,
               then at your next hearing, because some of the same questions are
21             going to come up regarding your motorcycle gang or group
               participation, that you address those things and be very specific if
22             you choose to do so.

23   (Id., at 26-27.)

24             When a prisoner acknowledges his involvement in the commitment offense, but

25   attempts to minimize his role, the BPH may properly rely on lack of remorse or lack of insight in

26   making parole decisions.  In re Lazor, 172 Cal.App.4th 1185, 1202, 92 Cal.Rptr.3d 36 (2009)

                                        13

1    ("An inmate's lack of insight into, or minimizing of responsibility for, previous criminality,

2    despite professing some responsibility, is a relevant consideration"); In re Elkins, 144

3    Cal.App.4th 475, 494, 8 Cal.Rptr.3d 82 (2006) ("Elkins had admitted his guilt of these crimes

4    decades earlier. Thus, the Governor relied not on a lack of guilt admission, but on Elkins having

5    delayed coming forward with all circumstances of what he admitted."); In re Rozzo, 172

6    Cal.App.4th 40, 62 n.9, 91 Cal.Rptr.3d 85 (2009) ("While it is improper to rely on a prisoner's

7    refusal to address the circumstances of the commitment offense in denying parole, evidence that

8    demonstrates a prisoner's insight, or lack thereof, into the reasons for his commission of the

9    commitment offense is relevant to a determination of the prisoner's suitability for parole.").

10           The undersigned has reviewed the portion of the suitability hearing transcript

11   where petitioner discussed his involvement in the motorcycle gang.  (Dkt. No. 1, part 1, at 44-46,

12   47-51, 54, 63-66, 91-92, 98-99.)  The BPH's finding that petitioner minimized his involvement

13   in the motorcycle club is supported by the record.[1]  For example, petitioner testified that as

14   president, he ran the motorcycle club the way the other members wanted him to run it:

15                    Well, when I first got into the club, like I said, it wasn't an outlaw
                      club.  It was more of a social club, had a lot of picnics and trips
16                    where we took our spouses and what with us and over the years, it
                      gradually became a criminal club. . . .  Because at that time, that's
17                    the way the club, that's what they were doing. . . . It's not
                      something that I just jumped right into.  It just kind of happened.
18                    Some people in the club were in the criminal element.  They had
                      their own businesses and worked and what not and some didn't and
19                    gradually, it just became more of an outlaw club.  I guess because I
                      was already entrenched in it, part of the club.  The members at that
20                    election, they elected me president to run it.  Just like anything else
                      and they wanted the outlaw club and the criminal activity and
21                    that's the way I ran it.  In hindsight, it was all a wrong, it was a
                      mistake then but at that time in my life, that's what I did.
22

23   (Id., at 63-65.)  Similarly, petitioner testified that he had owned numerous guns.  (Id. at 48-49.)

24   _____

25          [1]  At the suitability hearing, petitioner denied committing the murder.  The BPH did not
     find him unsuitable based on his refusal to admit committing the offense.  (Dkt. No. 1, part 2, at
26   27.)

                                               14

He also admitted that other members of the motorcycle gang were involved in gunfights.  (Id.)

Yet, petitioner testified that, despite being president of the motorcycle club, he only carried guns

to protect himself.  (Id.)

In summary, the factors relied on by the BPH to find petitioner unsuitable are

supported by the record.  The undersigned now considers whether there was some evidence that

these factors were indicative of his current dangerousness.

At the time of the 2007 suitability hearing, petitioner had served 25 years of his 27

years to life sentence.  The 2007 hearing was his fifth suitability hearing.  Petitioner's prison

record, as discussed at the hearing, was very good.  At the conclusion of the hearing, the BPH

stated that, "as a prisoner, you've done exceptionally well in programming while you've been

incarcerated.  In fact, you should be considered a model prisoner."  (Dkt. 1, part 2, at 21 of 121.)

The BPH went on to state,

> You've developed marketable skills that you can put to use in the
> outside.  You've upgraded yourself, certainly vocationally.  You
> have participated well in self-help programs.  In regarding to your
> counseling chronos, you've had two 128s and you had no 115s for
> the entire time that you've been in prison.  That's exceptional.
> Your last psychological report, 1/28/2005 G.R. Gretman, Doctor of
> Education.  That was a favorable psych report.  He said in essence,
> under assessment of dangerousness: "Inmate Gary continues his
> activity, active involvement in his educational self-help activities.
> He served over two decades in prison for a violent crime he
> maintains he did not commit.  He does admit, however, that his
> lifestyle at the time was what got him in to prison in the first place.
> Today, he's learned to have a lot more respect for freedom since
> being incarcerated feels impossible that he would resume any of it
> close to the lifestyle he used to live.  Specifically, he feels his being
> involved in the violent lifestyle, violent motorcycle gang and
> manufacture and sale of drugs was bound to get him in prison.  He
> denies being involved with this specific murder.  He is able to
> express appropriate remorse for another human being violated and
> losing his life.  It would appear that Inmate Gary would pose a
> lower risk to society if he were granted release as compared to
> other parolees his age and as compared to the general public."
> Your parole plans, you have viable residential plans and back up
> plans to your parole plans.  The issue of legal residence is no
> longer an issue as long as the Commissioner of your hearing, once
> you receive a grant is in concurrence, you can pretty much go to
> any county you wish inside of California.  You do have acceptable

1  employment plans.  You have multiple employment plans and back
   up to your plans.  You do have a marketable skill.  You also have
2  noted to us that you have the contact with or at least have the
   access, access information as to where you could attend NA or NA
3  meetings up your, if you happen to be released some time in the
   future.
4

5  (Id., at 21-23.)

6          The undersigned acknowledges that the outcome of this case is a close call.

7  Nevertheless, despite petitioner's very good prison record, the undersigned finds that the factors

8  relied on by the BPH were some evidence of his current dangerousness.  In particular,

9  petitioner's minimization of his involvement in the motorcycle gang was some evidence that he

10 continued to remain a threat to public safety.  Petitioner's minimization of his involvement in the

11 motorcycle gang rendered the circumstances of the commitment offense, his criminal record and

12 unstable social history still relevant in determining current dangerousness.  The decision by the

13 Stanislaus County Superior Court denying petitioner's habeas petition was not an unreasonable

14 application of clearly established Supreme Court authority.  Accordingly, the petition should be

15 denied.[2]

16 _____

17          [2] The undersigned acknowledges that petitioner has filed two other habeas petitions in
   this court challenging parole suitability hearings.  In Gary v. Kramer, 2:06-cv-2821 FVS P,
18 petitioner challenged the 2005 decision by the BPH finding him unsuitable.  In 2005, the BPH
   found petitioner unsuitable based on the same factors relied on by the BPH to find petitioner
19 unsuitable in 2007.  (See 2:06-cv-2821 FVS P, Dkt. No, 1, part 2, at 13-17.)  On April 29, 2010,
   the Honorable Fred Van Sickle denied this petition finding the decision of the BPH to be
20 supported by some evidence.  In Gary v. Hill, 2:10-cv-1761 KJM P, petitioner challenges the
   2008 decision by the BPH finding him unsuitable.  Petitioner was found unsuitable in 2008 based
21 on the same factors relied on by the BPH in 2007 finding him unsuitable as well as petitioner's
   claim of innocence.  (See CIV S-10-cv-1761 KJM P, Dkt. No. 1, part 2, at 13-19.)  This action
22 has not yet been decided.
          The BPH is precluded from conditioning a prisoner's parole on an admission of
23 guilt.  Cal. Penal Code § 5011(b).  However, California courts have held that the BPH may
   consider a lack of insight as a factor weighing against parole without violating § 5011 if the
24 prisoner's version of events is "physically impossible [or] strain[s] credulity such that his denial
   of an intentional killing [is] delusional, dishonest, or irrational."  See In re Palermo, 171
25 Cal.App.4th 1096, 1112, 90 Cal.Rptr.3d 101 (2009) (citing In re Shaputis, 44 Cal.4th 1241, 82
   Cal.Rptr.3d 213 (2008); and In re McClendon, 113 Cal.App. 4th 315, 6 Cal.Rptr.3d 278 (2003)).
26 Because petitioner was not found unsuitable for parole in 2007 based on his claim of innocence,

1    Conclusion

2            If petitioner files objections, he shall also address whether a certificate of

3    appealability should issue and, if so, why and as to which issues.  A certificate of appealability

4    may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the

5    denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

6            Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

7    a writ of habeas corpus be denied.

8            These findings and recommendations are submitted to the United States District

9    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

10   one days after being served with these findings and recommendations, any party may file written

11   objections with the court and serve a copy on all parties.  Such a document should be captioned

12   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

13   objections shall be filed and served within fourteen days after service of the objections.  The

14   parties are advised that failure to file objections within the specified time may waive the right to

15   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16   DATED:  January 12, 2011

17

18

19                                        _____

20                                        KENDALL J. NEWMAN
                                         UNITED STATES MAGISTRATE JUDGE

21   gary946.157

22

23

24

_____

25

26   the undersigned makes no finding regarding whether the 2008 BPH properly relied on this factor
     in finding petitioner unsuitable for parole.